# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

SANDEE'S BAKERY,                          Court File No. _____

                                  Plaintiff,

    v.

AGRI STATS, INC., CLEMENS FOOD
GROUP, LLC, HORMEL FOODS
CORPORATION, INDIANA PACKERS
CORPORATION, JBS USA, SEABOARD
FOODS, LLC, SMITHFIELD FOODS,
INC., TRIUMPH FOODS, LLC, AND
TYSON FOODS, INC.,

                                  Defendants.

---

## Class Action Complaint and Demand for Jury Trial

---

Plaintiff Sandee's Bakery, for its Complaint against Defendants, states and alleges as follows:

1.      Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class consisting of all entities that purchased pork[1] indirectly from a Defendant or co-conspirator in the United States during the Class Period for their own business use in commercial food preparation from at least January 1, 2009 until the present (the "Class Period"). Plaintiff brings this action against Defendants for injunctive relief and treble damages under the antitrust laws of the United States and various state antitrust, consumer

---

[1] For the purposes of this complaint, pork includes pig meat purchased fresh or frozen, smoked ham, sausage and bacon. From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

protection and unfair trade practices, and unjust enrichment laws and demands a trial by jury.

## Nature of the Action

2.      The pork integrator-Defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The pork industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork market.

3.      These Defendants, Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC ("Clemens"), Hormel Foods Corporation ("Hormel"), Indiana Packers Corporation ("Indiana Packers"), JBS USA, Seaboard Foods LLC ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"), entered into a conspiracy from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork. The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating their output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume and demand through their co-conspirator, Defendant Agri Stats.

4.      Beginning in at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to the majority of pork integrators. Benchmarking allows

competitors to compare their profits or performance against that of other companies. But Agri Stats' reports are unlike those of other lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would share with each other in a normal, competitive market. Instead, the provision of this detailed information acts as the modern equivalent of the proverbial smoke-filled room of the cartels of yesteryear. Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to the pork integrators. On a weekly and monthly basis, Agri Stats provides the pork integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belongs to which producers. The effect of this information exchange was to allow the pork integrators to monitor each other's production and hence control supply and price.

5.     This data exchange through Agri Stats bears all the hallmarks of the enforcement mechanism of a price-fixing scheme. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2] Second, information contained in Agri Stats reports is specific to pork producers, including information on profits, prices, costs and production levels,

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

instead of being aggregated as industry averages, thus avoiding transactional specificity and easy identification of specific producers. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service which required the co- conspirators to pay millions of dollars over the Class Period – far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.

6.     The pork producers admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen.

7.     In addition, there are numerous "plus factors" in the swine industry during the Class Period, including but not limited to multiple industry characteristics which facilitate collusion, such as high vertical integration, high barriers to entry, high pork industry consolidation and concentration, inelastic supply and demand, and a lack of significant substitutes for pork.

8.     Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiff and class members. Beginning in 2009, the earnings of the integrators began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, Plaintiff and the classes paid artificially inflated prices for pork during the Class Period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market. Thus, Plaintiff and class members were injured by Defendants' conduct.

**Jurisdiction and Venue**

9.      Plaintiff seeks damages, restitution, treble damages, disgorgement, other monetary relief, injunctive and other equitable relief under various state antitrust, consumer protection and unfair trade practices laws, and state unjust enrichment laws, as alleged specifically herein, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendants' violations of those laws.

10.     This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of some of the Classes who are citizens of different states than Defendants.

11.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District. Defendant Hormel's headquarters are located in Minnesota.

12.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was

directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

13.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

14.     No other forum would be more convenient for the parties and witnesses to litigate this case.

**Parties**

**A.      Plaintiff**

15.     Plaintiff Sandee's Bakery is located at 1284 E 2nd St, Jamestown, NY 14701. It indirectly purchased pork made by one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**B.      Defendants**

16.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator of Defendant Producers by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co- conspirators.

17.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the Class Period, Clemens and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or

through its wholly owned or controlled affiliates, to purchasers in the United States.

18.     Hormel Foods Corporation is a Delaware corporation engaged in the production of meat and food products, and the marketing of these products. Hormel Foods is headquartered in Austin, Minnesota. During the Class Period, Hormel Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19.     Indiana Packers Corporation is an Indiana corporation engaged in the production of meat and food products, and the marketing of these products. Indiana Packers is headquartered in Delphi, Indiana. During the Class Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.     JBS USA is one of the world's largest beef and pork processing companies and an indirect wholly owned subsidiary of Brazilian-based JBS SA. JBS USA is a wholly owned subsidiary of JBS USA Holdings, Inc., which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA is a Delaware corporation, headquartered in Greeley, Colorado. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

21.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee

Mission, Kansas. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

22.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, the largest pork company in the world.[3] Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23.     Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the Class Period, Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce,

24.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

25.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or

---

[3] 2014 Annual       Report,       WH Group at 175, Smithfield, https://www.smithfieldfoods.com/investor-relations (last visited June 26, 2018).

through its wholly-owned or controlled affiliates, to purchasers in the United States.

26.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Class Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

27.     Defendants Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. are collectively referred to as "Tyson."

## Factual Background

28.     Starting in at least 2009 and continuing to the present, Defendants coordinated to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their anticompetitive agreement, Defendants relied on a unique industry data sharing service known as Agri Stats. Agri Stats provided a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

**A.     Defendants' anticompetitive scheme started from Agri Stats' central role in collusion in the broiler industry.**

29.     Agri Stats has played a central role in other industries, including collusion in the broiler industry.[4] As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16- cv-08637 (N.D. Ill.), the broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

---

[4] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

30.    In the broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler Defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. also known as EMI.

31.    The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

32.    In the broiler industry, plaintiffs also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that

furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply.

33.     In denying defendants' motions to dismiss in the *In re Broiler Chicken Antitrust Litigation,* the district court noted that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which raise significant antitrust concerns.[5]

## B.     After success in the broiler industry, Agri Stats markets its collusive scheme to the swine integrators.

34.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the swine industry along the lines of the benchmarks used to restrict competition in the broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies.[6] Benchmarking of the type undertaken by Agri Stats and its co-conspirators here reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive information among competitors.

---

[5] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

[6] *Antitrust Issues Related to Benchmarking and Other Information Exchanges*, Federal Trade Commission (May 3, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issues-related -benchmarking-and-other-information-exchanges/110503roschbenchmarking.pdf.

35.     In 2008, Greg Bilbrey of Agri Stats told swine industry producers that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. *Each and every commercial swine operation is encouraged to participate in some benchmarking effort."[7]*

36.     Agri Stats emphasized to pork producers that the goal of the agreement to share information was profitability, not production, and invited pork producers again to participate in the benchmarking. Agri Stats emphasized that "We must remember that the *ultimate goal is increasing profitability* – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking*. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program*."[8]

37.     In April 2009, Agri Stats again invited swine producers to design and operate their own benchmarking effort. Greg Bilbrey of Agri Stats invited swine producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. *Producer groups could design and operate their own benchmarking effort*."[9]

38.     The pork producers did accept this offer and, beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports.

---

[7] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, 43 (2008).
[8] *Id.* at 41-46.
[9] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

Defendants' agreement was to use the exchanged benchmarking information to coordinate supply and stabilize and increase prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. The agreement was successful as pork prices rose significantly after the agreement was reached.

39.     The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the Class Period were:

        2016 - $18.9 billion
        2015 - $21.0 billion
        2014 - $26.4 billion
        2013 - $23.4 billion

40.     Each Defendant's annual sales of pork products are also very large. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits.

## C.   Agri Stats provided pork integrators the unparalleled ability to monitor pricing and production, and to discipline co-conspirators for not complying with the collusive agreement.

41.     Agri Stats provided pork integrators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was key to the formation, operation and continuing stability of the Defendants' anticompetitive scheme. To effectuate their agreement, the participants had to have confidence that each member was following

through with the agreement by limiting their production and stabilizing prices. Agri Stats served that function.

42.     Each member of the conspiracy, including swine integrators and Defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats subscribers and reported their information to Agri Stats. Agri Stats' parent company, Eli Lilly, stated that "*over 90% of the poultry and pig market*" uses Agri Stats in the United States.[10]

43.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way.[11]

44.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul,

---

[10] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept.13, 2016).

[11] Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).

Profit and Sales.[12] Participants may also receive an abbreviated Key Performance Indicator report, as well as, historical graphs.[13]

45.  Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

46.  One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market:[14]

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | 6 | 8 | | 5 | 3 |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

47.  The purpose of these reports was not to provide better prices to customers or to lower the costs of production. Instead, the purpose was to improve the profitability of

---

[12] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 9.
[13] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, *supra* note 8.
[14] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.) This underlines that the purpose of these reports was not to allow customers to save more money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the Defendant companies and the impact was higher prices for pork customers.

48.     Much of the information shared by Agri Stats and the other Defendants was unnecessary to achieve any benefits for customers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[15]

49.     Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis among competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis among competitors

---

[15] *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-          other-international-competition-fora/1010informationexchanges.pdf.

without Agri Stats auditing and standardizing the data:[16]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



50.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit*."[17]

51.     In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis.[18] The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees

---

[16] Greg Bilbrey, *Data Integrity*, Slideshare.net (Sept. 21, 2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

[17] *Id.*

[18] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 9.

to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books.

52.     In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets started providing its extensive pricing reports to broiler producers in 2003.[19]

53.     By providing detailed production statistics by producer, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed- upon plans for coordinated production limits. Critically, Agri Stats provided forward- looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

54.     Agri Stats reports are organized by company and facility, but the producers' names are not listed in the reports. Nevertheless, while nominally anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that producers can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

55.     Moreover, Agri Stats knew that the anonymity of its system was compromised

---

[19] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer, May 26, 2015, *available at* http://www.nationalhogfarmer.com/marketing/paragon- economics-sold-express-markets.

by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an arduous undertaking the company was not eager to embark on.

56.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

57.     Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a producer's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that producer given that their numbers were highlighted by Agri Stats in their books.

58.     Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which may have existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats were aware of this fact, but did nothing to address it.

59.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Anticompetitive cartels are subject to

inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

60.     In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel.***"[20]

---

[20] Christopher Leonard, *Is the Chicken Industry Rigged*, Bloomberg, (Feb. 15, 2017), https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

**D.      The pork industry is nearly fully vertically integrated, which allowed the scheme to succeed.**

61.      The pork production industry is almost completely vertically integrated, with four major producers controlling 75 percent of pork integration. Very large pork producers are commonly characterized as "contractors" or "integrators" who contract production of their hogs out to independent growers.[21] Integration is so pervasive that major producers are commonly called pork or swine integrators by the industry, government, analysts and academics.

62.      In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[22]

63.      Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. As is clear from Smithfield's annual report, under these arrangements, the pork integrators pay only fixed service fees to the farmers, who bear all of the investment costs of the hog-raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all

[21] Vertical Integration in the Pork Industry, University of Oregon (July 2005)
[22] Smithfield Foods Annual Report, at 27 (2014).

points in time. This arrangement essentially converts independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

**E.      The level of concentration in the pork industry was optimal for Defendants' collusive scheme.**

64.      Prior to and in the beginning of the Class Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1980 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1980 to 66 percent by 2015. The top eight integrators had a combined market share of well over 80 percent for the entire Class Period.

**Figure 1: Combined Market Share of Top 4 Pork Integrators 1980 to 2015**



Combined Market Share of Four Largest Slaughter Entities from 1980 to 2015

Source: United States Department of Agriculture
Notes: Market share percentages from 1981 to 1994 and market share percentages from 1996 to 1999 are linearly interpolated

65.     The hog production sector is horizontally concentrated (only a few companies buy, slaughter and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non- competitive behavior and result in adverse economic performance.

66.     In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing

67.     The acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately US$6.3 billion, and a processing capacity of about 90,000 hogs per day and

two million pounds of bacon per week.[23] After the acquisition closed, the new JBS- Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).[24]

68.     Barriers to entry kept competitors out of the pork packing industry. New entry into pork processing is costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs are substantial. In 2012, it cost Cargill $25 million just to expand an existing facility. Building a facility from scratch would be considerably more.[25]

69.     The concentration level in the pork industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. market pork industry as "relatively mature and concentrated."[26] Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

70.     The level of concentration in the pork industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was

---

[23] JBS Concludes Cargill Pork Acquisition (Oct. 30, 2015).
[24] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition*, at 4 (White Paper).
[25] *Id.* at 7.
[26] WH Group Interim Report, at 5 (2017).

necessary to inflate price.

**F.    Abnormal pricing during the Class Period demonstrates the success of the collusive scheme.**

71.    Beginning in 2009, the pork industry showed abnormal price    movements. According to aggregate prices published by the USDA, the hog market year average price was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015. The following graph shows the unprecedented increase in swine prices beginning in 2009, and continuing into 2014, before declining in mid-2014:

**Figure 2: U.S. Hog Producer Price Index, 2000-2018**



Source: Federal Reserve Bank of St. Louis

72.    Publicly available (albeit aggregated data) also shows that during this period, whole price variation/risk was almost entirely shouldered by farmers, while the pork integrators' earnings increased steadily over the years 2009 to 2017, with a slight decline in 2017:

**Figure 3: Integrators and Farmers (Growers) Earning per Retail weight: 2000-2017**



### G.     Capacity and supply restraints during the Class Period.

73.     As demonstrated in the following chart, at several points during the Class Period, the pork integrators acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production. (The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.) The decreases in production largely occurred after decrease in pork wholesale prices.

**Figure 4: U.S. Annual Total Number of Hogs Slaughtered Commercially: 1997-2016**



U.S. Annual Total Number of Hogs Slaughted Commercially From 1997 To 2016

Source: United States Department of Agriculture

74.     In public earnings calls, Defendants made statements regarding their intentions to either stabilize or decrease supply (although gave false reasons for this stabilization). For example, in May 2009, Larry Pope, the CEO and President of Smithfield, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows* and 1 million of our 18 million pigs, we started taking out of the system.[27]

75.     In May 2009, Hormel confirmed that "[w]e see a contraction in the overall

---

[27] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009).

supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[28]

76.     In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . *That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.* We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[29]

77.     In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> *We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.* But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. *But the answer is, yes, there are others cutting back. We're not the only one.*[30]

78.     In March 2010, when asked about fourth quarter and 2011 volumes for pork,

---

[28] Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).
[29] Q4 2009 Smithfield Foods Earnings Conference Call – Final (June 16, 2009).
[30] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009).

Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[31]

79. The pork producers acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can. *Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have.* And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[32]

Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

80. Supply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of the animals. In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we

---

[31] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

[32] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010).

don't believe that is true. If we look at supply, current cattle
and hogs production levels can't change much in 2011 because
of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the

provision of competitively sensitive information by a competitor of Tyson.

81.     In the face of ever-increasing margins, when asked whether the type of

profits would continue, in March 2011, Smithfield publicly signaled to its competitors that

it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.
> Yet we are projecting over the next 90 days we will be up
> another 20% from that. I mean those are big numbers to get the
> meat prices in the retail and food service case to cover that. . .
>
> HEATHER JONES: So you are just striking a note of caution
> *because you know it can't stay this way indefinitely*; but it's not that
> you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable
> horizon. We are still going to have -- should have good
> margins, but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are
> halfway -- closing in on halfway through our fourth quarter,
> and we have had very good margins through February and
> March, through today. We have got double-digit margins
> today.
>
> BO MANLY: It will correct itself over the long run, because
> this type of return on investment would attract capital, would
> attract expansion, and we kill more pigs and drive the margins
> lower. So it will either happen by itself or someone is going to
> build a plant.
>
> HEATHER JONES: All right, okay. Thank you.
>
> LARRY POPE: You get two-year visibility on that, though.
> You get to know when somebody is building a plant because

they have got to file for a permit and they have actually got to build the thing. . . . *And by the way, we are not going to build a new plant to expand capacity.*[33]

82.     In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. *There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.*[34]

## H.     Overcharges due to the cartel were reflected in higher pork prices.

83.     The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[35]

84.     The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index (CPI). Those prices show that the retail price of pork has increased substantially for consumers over the Class Period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017. The following figure shows the substantial increase in the price of bacon, particularly beginning

---

[33] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011).

[34] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

[35] John King (USDA), *Concentration and Technology in Agricultural Input Industries*, at 2 (March 2001).

in 2010.

**Figure 5: CPI-Average Price Data for Bacon, Sliced, per pound: 1995-2018**



Source: Bureau of Labor Statistics

85.     Similarly, the CPI for other pork products shows a marked increase over

the Class Period.

**Figure 6: CPI-Average Price Data for Other Pork, per pound: 1997-2018**



Source: Bureau of Labor Statistics

31

86.    Finally, the CPI for another commonly purchased consumer item, ham (excluding canned ham and luncheon slices) shows an increase from $2.16 at the end of 2009 to $2.91 at the end of 2017.

**Figure 7: CPI-Average Price Data for Ham, per pound: 1998-2018**



87.    Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to stabilize the price and supply of pork was borne in large part by Plaintiff and the Plaintiff Class.

## I.    Defendants actively concealed the conspiracy.

88.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and class members.

89.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret

meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

90.     In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. *There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background*, and really our specialty is working directly with companies about their opportunities and so forth.[36]

91.     At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."[37] And yet, despite refusing to show this information publicly, competitors were provided with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.

---

[36] Sanderson Farms Investor Day – Final (Oct. 2009).

[37]    *Id.*

92.     At other times, producers attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, the CEO Of Smithfield stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[38]

93.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

## Class Action Allegations

94.     Plaintiff brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All entities that indirectly purchased pork from Defendants or co-conspirators in the United States during the Class Period for their own business use in commercial food preparation.

---

[38] Event Brief of Q4 2012 Smithfield Foods Earnings Conference Call – Final (June 14, 2012).

95.     Plaintiff also brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[39] on behalf of the following class (the "Damages Class"):

> All entities in the Indirect Purchaser States that indirectly purchased pork from Defendants or co-conspirators in the United States during the Class Period for their own business use in commercial food preparation.

96.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

97.     Plaintiff reserves the right to modify the class definition at a later date, including to add the first level of indirect purchasers.

98.     While Plaintiff does not know the exact number of the members of the Classes, there are likely thousands of class members.

99.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes

---

[39] The Indirect Purchaser States, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of pork in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of pork sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for pork, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiff and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

100.     Plaintiff's claims are typical of the claims of the members of the Classes.

Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for pork purchased indirectly from Defendants and/or their co-conspirators. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

101.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

102.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

103.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach

more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

104.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## Causes of Action

## Count One

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

105.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

106.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

107.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for pork, thereby creating anticompetitive effects.

108.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

109.     As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated class members in the Nationwide Class that purchased pork have been harmed by being forced to pay inflated, supracompetitive prices for pork.

110.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

111.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for pork provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiff and members of the Nationwide Class who purchased pork indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

112.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for pork purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

113.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

114.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

### Count Two

### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

115.    Plaintiff repeats the allegations set forth above as if fully set forth herein,

and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

116. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of pork in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

117. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for pork and to allocate customers for pork in the United States and its territories.

118. In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price pork at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by plaintiff and members of the Damages Class with respect to pork provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

119. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of pork. As a direct and proximate result, plaintiff and members of the Damages Class were deprived of free and open competition and paid more for pork than

they otherwise would have in the absence of defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

120.     In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiff and the members of the Damages Class.

121.     Accordingly, plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

122.     Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

123.     **Arizona:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq.*  Defendants' conspiracies had the following effects: (1) price competition for pork was restrained, suppressed and eliminated throughout Arizona; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, defendants' illegal conduct substantially affected Arizona commerce. Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401 *et seq.*

124.     **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq.*  During the Class

Period, defendants and their coconspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code §16720.   Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of pork at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of pork.   For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of pork.   The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for pork has been restrained, suppressed and/or eliminated in the State of California; (2) prices for pork provided by defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California and throughout the United States; and (3) those who purchased pork indirectly from defendants and their co-conspirators have been deprived of the benefit of free and open competition.   As a result of defendants' violation of Cal. Bus. & Prof. Code §16720, plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

125.   **District of Columbia:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501 *et seq*.   Defendants'

combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout the District of Columbia; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) plaintiff and members of the Damages Class, including those who resided in the District of Columbia and purchased pork in the District of Columbia, paid supracompetitive, artificially inflated prices for pork, including in the District of Columbia. During the Class Period, defendants' illegal conduct substantially affected commerce in the District of Columbia.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501 *et seq.*  Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501 *et seq.*

126.  **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants sold the Pork at Issue in Illinois, during the Class Period. Defendants' combination or conspiracy had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Illinois; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce; (3) Plaintiff and members of the Damages Class, who resided in Illinois and/or purchased the Pork at Issue in Illinois were deprived of free and open competition in Illinois; and (4) Plaintiff and members of the Damages Class, who resided in Illinois and/or purchased the Pork at Issue in Illinois paid supracompetitive, artificially inflated prices for the Pork at

Issue, in Illinois. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

127. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Iowa; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1 *et seq.* Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

128. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Kansas; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, defendants' illegal conduct substantially affected Kansas commerce. Accordingly, plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101 *et seq.*

129. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or

conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Maine; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine.  During the Class Period, defendants' illegal conduct substantially affected Maine commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

130.   **Michigan:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Michigan; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan.  During the Class Period, defendants' illegal conduct substantially affected Michigan commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771 *et seq.*

131.   **Minnesota:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49 *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Minnesota; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Minn. Stat. §325D.49 *et seq.*

132.    **Mississippi:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code §75-21-1 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Mississippi; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Miss. Code §75-21-1 *et seq.*

133.    **Nebraska:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Nebraska; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska.  During the Class Period, defendants' illegal conduct substantially affected Nebraska commerce.  Accordingly, plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801 *et seq.*

134.    **Nevada:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Nevada; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, defendants' illegal conduct substantially affected Nevada commerce.  Accordingly,

plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010 *et seq.*

135. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New Hampshire; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1 *et seq.*

136. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New Mexico; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq.*

137. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New York; (2) pork

prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York. During the Class Period, defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly, plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq.*

138. **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout North Carolina; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq.*

139. **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout North Dakota; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01 *et seq.*

140. **Oregon:** Defendants have entered into an unlawful agreement in restraint

of trade in violation of Or. Rev. Stat. § 646.725 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Oregon; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, plaintif0sf and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780 *et seq.*

141.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Rhode Island; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11 *et seq.*

142.    **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout South Dakota; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, defendants' illegal conduct had a substantial effect on South

Dakota commerce.  Accordingly, plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

143.   **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Tennessee; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee.  During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq.*

144.   **Utah:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101*, et seq.*   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Utah; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.   Accordingly, plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

145.   **Vermont:**    Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Vermont; (2) pork prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under 9 V.S.A. § 2465 *et seq.*

146.  **West Virginia:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, et seq.   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout West Virginia; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, defendants' illegal conduct had a substantial effect on West Virginia commerce.   Accordingly, plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, et seq.

147.  **Wisconsin:**   Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01 *et seq.*   Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Wisconsin; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin. During the Class Period, defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, plaintiff and members of the Damages Class seek all relief available under Wis. Stat. §133.01 *et seq.*

## Count Three

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff and the Damages Class)

148.     Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

149.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

150.     **Alaska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which pork at issue was sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Alaska; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and pork purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiff and

members of the Damages Class seek all relief available under that statute.

151.   **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101 *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at noncompetitive and artificially inflated levels, the prices at which pork was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from plaintiff and members of the Damages Class.  The aforementioned conduct on the part of the defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Arkansas; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas. During the Class Period, defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, plaintiff and the members of the Damages Class seek all relief available under that statute.

152.   **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*  During the Class Period, defendants manufactured, marketed, sold, or distributed pork in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200 *et seq.*, by engaging in the acts and practices specified above.  This claim is instituted pursuant to Cal. Bus. & Prof. Code

§§17203 and 17204, to obtain restitution from these defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200.  The acts, omissions, misrepresentations, practices and nondisclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720 *et seq.*, set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720 *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) defendants' acts or practices are unfair to purchasers of pork in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.*  Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business acts or practices.  The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.  The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiff and the members of the Damages Class to pay supracompetitive and artificially

inflated prices for pork. Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200 *et seq.* As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

153.    **Colorado**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as actual or potential purchasers of the Defendants' goods and which caused Plaintiff to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Colorado; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and purchasers of pork. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiff and members of the Class seek all relief available

under that statute and as equity demands.

154.  **Delaware**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.* Defendants sold the Pork at Issue, in Delaware, during the Class Period and deceived Plaintiff and/or class members in Delaware into believing that the Pork at Issue were competitively priced. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Delaware; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiff and members of the Damages Class, who resided in Delaware and/or purchased the Pork at Issue in Delaware were deprived of free and open competition in Delaware; and (4) Plaintiff and members of the Damages Class, who resided in Delaware and/or purchased the Pork at Issue in Delaware paid supracompetitive, artificially inflated prices for the Pork at Issue, in Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law,

Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

155.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq.*  Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Florida; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida. During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, plaintiff and members of the Damages Class seek all relief available under Fla. Stat. §501.201 *et seq.*

156.    **Georgia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling,

and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Georgia; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute and as equity demands.

157.    **Minnesota**: Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as purchasers of the Defendants' goods and which caused Plaintiff to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and pork purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute and as equity demands.

158.    **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed pork at Issue in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and pork purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of

Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

159.    **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* Defendants sold the Pork at Issue in New Hampshire and deceived Plaintiff and Class Members in New Hampshire into believing that the Pork at Issue were competitively priced. Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased the Pork at Issue in New Hampshire were deprived of free and open competition in New Hampshire; and (4) Plaintiff and members of the Damages Class, who resided in New Hampshire and/or purchased the Pork at Issue in New Hampshire paid supracompetitive, artificially inflated prices for the Pork at Issue, in New Hampshire. During the Class Period, Defendants marketed, sold, or distributed pork at Issue in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and pork purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

160.    **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, plaintiff and members of the Damages Class lacked any meaningful choice in purchasing pork because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of pork, including their illegal conspiracy to secretly fix the price of pork at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of plaintiff and the public. Defendants took grossly unfair advantage of plaintiff and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New Mexico; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for pork.  During the Class Period, defendants' illegal conduct substantially affected New Mexico commerce and consumers.  As a direct and proximate

result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

161.    **New York:**   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which pork were sold, distributed or obtained in New York and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants and their coconspirators made public statements about the prices of pork that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for pork; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased pork were misled to believe that they were paying a fair price for pork or the price increases for pork were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing pork would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing pork

would have a broad impact, causing commercial and institutional indirect food preparer class members who indirectly purchased pork to be injured by paying more for pork than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of customers and commercial and institutional indirect food preparers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout New York; (2) pork prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for pork. During the Class Period, Defendants marketed, sold, or distributed pork in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed pork in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

162.    **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting,

fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which pork were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout North Carolina; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) plaintiff and members of the Damages Class were deprived of free and open competition; and (4) plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for pork. During the Class Period, defendants marketed, sold, or distributed pork in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured,

sold and/or distributed pork in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq.*, and, accordingly, plaintiff and members of the Damages Class seek all relief available under that statute.

163.     **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout North Dakota; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and pork purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money

or property as a result of Defendants' use or employment of unconscionable and deceptive

commercial practices as set forth above. That loss was caused by Defendants' willful and

deceptive conduct, as described herein. Defendants' deception, including their affirmative

misrepresentations and omissions concerning the price of pork at Issue, misled all

purchasers acting reasonably under the circumstances to believe that they were purchasing

pork at Issue at prices set by a free and fair market. Defendants' misleading conduct and

unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*,

and, accordingly, Plaintiff and members of the Damages Class seek all relief available under

that statute.

164. **Rhode Island:** Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair

Trade Practice and Consumer Protection Act (R.I. Gen. Laws § 6-13.1-1, et seq.) Members

of the Damages Class purchased pork for personal, family, or household purposes.

Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that

includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and

non-competitive levels, the prices at which pork were sold, distributed, or obtained in

Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and

members of the Damages Class concerning Defendants' unlawful activities and artificially

inflated prices for pork. Defendants owed a duty to disclose such facts, and considering the

relative lack of sophistication of the average, non-business purchaser, Defendants breached

that duty by their silence. Defendants misrepresented to all purchasers during the Class

Period that Defendants' pork prices were competitive and fair. Defendants' unlawful

conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) pork prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for pork. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including commercial and institutional indirect food preparers that serve as a conduit to consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of pork they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

165.    **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair

Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout South Carolina; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq.*, and, accordingly, plaintiff and the members of the Damages Class seek all relief available under that statute.

166. **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout South Dakota; (2) pork at Issue prices

were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and on those who purchased pork in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of pork at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

167.    **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and

artificially inflated prices for pork. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork, likely misled all commercial and institutional indirect food preparer purchasers acting reasonably under the circumstances to believe that they were purchasing pork at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

168.    **West Virginia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in West Virginia.

Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout West Virginia; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of pork at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

169.    **Wisconsin**: Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout Wisconsin; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of pork at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiff and members of the

Damages Class seek all relief available under that statute.

## Count Four

## Unjust Enrichment[40]
## (on behalf of Plaintiff and the Damages Class)

170.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

171.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

172.    Defendants have unlawfully benefited from their sales of pork because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held commercial and institutional indirect food preparers, which purchased pork at prices that were more than they would have been but for Defendants' unlawful actions.

173.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

174.    Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

175.    Defendants have been enriched by revenue resulting from unlawful

---

[40] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

overcharges for pork while Plaintiff has been impoverished by the overcharges they paid for pork imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiff's impoverishment are connected.

176.     There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

177.     Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

178.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of pork.

179.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of pork are ascertainable by review of sales records.

180.     It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of pork.

181.     It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they

indirectly purchased pork, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

182.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for pork is a direct and proximate result of Defendants' unlawful practices.

183.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

184.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for pork derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

185.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as pork prices remain inflated above pre-conspiracy levels.

186.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of pork.

187.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of pork by Plaintiff and the

Damages Class. Plaintiff and the Damages Class have no adequate remedy at law.

## Relief Sought

**Wherefore**, Plaintiff demands judgment for the following relief:

188.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

189.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

190.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

191.    Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

192.    Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair

competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

193.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

194.    Plaintiff and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

195.    Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

196.    Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## Jury Demand

197.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules

of Civil Procedure, of all issues so triable.

Dated: July 6, 2018                     Respectfully submitted,

                            By:    /s/ Shawn M. Raiter
                                   Shawn M. Raiter (MN#240424)
                                   **LARSON · KING LLP**
                                   30 East Seventh Street
                                   Suite 2800
                                   St. Paul, MN 55101
                                   Telephone: (651) 312-6518
                                   sraiter@larsonking.com

                                   Jonathan W. Cuneo
                                   Joel Davidow
                                   Blaine Finley
                                   **CUNEO GILBERT & LADUCA, LLP**
                                   4725 Wisconsin Ave. NW
                                   Suite 200
                                   Washington, DC 20016
                                   Telephone: 202.789.3960
                                   Facsimile: 202.589.1813
                                   jonc@cuneolaw.com
                                   joel@cuneolaw.com
                                   bfinley@cuneolaw.com

                                   Arthur N. Bailey
                                   Marco Cercone
                                   **ARTHUR N. BAILEY & ASSOCIATES**
                                   111 W. 2nd St., Suite 1100
                                   Jamestown, New York 14701
                                   Tel: (716) 664-2967
                                   Tel: (716) 854-3400
                                   artlaw@windstream.net
                                   cercone@ruppbaase.com